Filed 5/23/23  In re B.Y. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re B.Y., a Person Coming Under the Juvenile Court Law. | |
| | D081417 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. J516220G) |
| Plaintiff and Respondent, | |
| v. | |
| J.G., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael P. Pulos, Judge.  Affirmed.

Christopher Blake, under the appointment of the Court of Appeal, for Defendant and Appellant.

Claudia Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

# I.

# INTRODUCTION

J.G. (Father) appeals from a final order entered pursuant to Welfare and Institutions Code[1] section 366.26 terminating parental rights to his infant son, B.Y.

Father asserts two claims of error on appeal. First, Father contends that the juvenile court erred in failing "to make an explicit finding that ICWA [Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.)] did not apply to this case." He argues that the lack of an express determination of ICWA's inapplicability constitutes reversible error because recent changes in the law render an implied finding of ICWA inapplicability insufficient.

Second, Father contends that the Agency's initial ICWA inquiry was insufficient as to B.Y.'s mother. Specifically, Father posits that the Agency failed "to make immediate inquiries about the relatives of the minor about the child's ancestry and the subsequent 'disappearance' of known family members." He suggests that this court should require the Agency "to make a 'due diligence' effort to locate the missing relatives in much the same manner as it is required to exercise 'due diligence' to locate an absent parent."

We conclude that the juvenile court did not err with respect to its finding that ICWA does not apply in this case. We further conclude that the record supports the determination that the Agency undertook an adequate ICWA initial inquiry, and, even if we were to presume that the inquiry was not sufficient, Father cannot demonstrate prejudice resulting from any presumed insufficiency. We therefore affirm the juvenile court's order terminating Father's parental rights.

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Initial proceedings*

On August 25, 2020, the Agency filed a petition on behalf of newborn B.Y. pursuant to section 300, subdivision (b).  B.Y.'s mother N.Y. (Mother) admitted having methamphetamine while pregnant with him, and she tested positive for the substance at the time of his birth.[2]

In the Agency's detention report, senior protective services worker Shameka Clark indicated that she conducted an ICWA inquiry with Mother on August 20, 2020.  Mother denied having any Native American ancestry. Clark also noted that years earlier, on November 7, 2014, the juvenile court made a finding that ICWA did not apply to cases involving Mother's six other children with a different father, all of whom had been adopted.[3]

In the ICWA-010(A) form filed with the dependency petition, Clark reported that she had conducted an ICWA inquiry with Mother on August 20, 2020, and indicated that the inquiry gave her no reason to believe that B.Y. is or may be an Indian child.  The Agency also filed an Agency form titled "field worksheet for updating client demographics" (field worksheet) that was dated

---

[2]    Mother's parental rights had previously been terminated for six of B.Y.'s siblings.  The record also demonstrates that Mother suffered from serious mental health issues and appeared to be homeless throughout these proceedings; Mother eventually could not be located by the social workers assigned to this case.  She is not a party to this appeal.

[3]    In late August 2020, Clark also conducted an ICWA inquiry with the alleged father, A.R.  A.R. denied having any Native American ancestry, but A.R. was later excluded as B.Y.'s biological father.  As we explain further in this part, the juvenile court eventually struck A.R. from B.Y.'s petition and entered a judgment of nonpaternity on his behalf.

August 25, 2020, along with B.Y.'s petition. The box next to B.Y.'s name that was marked "ICWA?" was left unchecked. A section of the field worksheet that asked for the child's tribal affiliation was blank. On the field worksheet, the Agency noted that B.Y. was born in San Diego, California, and indicated that Mother lived in San Diego, California. The Agency reported Mother's ethnicity as "[w]hite[ ]" and indicated that her primary language was English.

At the time Clark wrote the August 26, 2020 detention report, B.Y. had been detained in a licensed foster home. Clark included in the detention report information from the cases of B.Y.'s six siblings, who were referenced in the petition, including their names, dates of birth, and petition numbers.[4] In past cases or prior child welfare referrals involving Mother's other children, the paternal grandmother, maternal grandmother, and a maternal uncle were mentioned.

On August 21, 2020, Clark called the adoptive parents for B.Y.'s older siblings. The adoptive parents did not answer, and Clark left a voicemail with her contact information and requested a return call. Clark had not received a response as of the August 26, 2020 report date. Clark spoke with Mother's friend, Shannon, by telephone on August 21, 2020. Shannon indicated that she had grown up with Mother and used to be her neighbor when Mother was living with Mother's grandparents, Mother's maternal grandmother, and Mother's brother Todd.

---

[4]     Although the report noted that Mother's other children did not share a father with B.Y., this was because Father had not yet been identified as the alleged father of B.Y. Subsequent reports indicated that Father *was* the father of Mother's other six children, as to whom ICWA was found not to apply.

When Clark met Mother at the hospital on August 20, 2022, Mother was disoriented. Mother declined to speak with Clark at a later time, and Clark had been unable to locate or reach Mother after this initial contact.[5]

At the August 26, 2020 detention hearing, Mother was present by telephone. The juvenile court appointed counsel for Mother and A.R., the presumed father at the time. The court made prima facie findings on B.Y.'s petition and detained B.Y. in a licensed foster home, but continued the detention hearing for a day.

At the August 27, 2020 continued detention hearing, A.R. was present by telephone. Counsel for Mother reported that Mother had no known Native American heritage. A.R. made a representation that he had no known Native American heritage as well. The juvenile court noted Mother's and A.R.'s statements regarding the lack of any known Native American heritage and found that ICWA did not apply. The court confirmed that B.Y.'s petition met the prima facie requirements under section 300, subdivision (b) and continued B.Y.'s out-of-home detention order.[6] The court ordered that Mother and A.R. would have supervised visits.

In the September 21, 2022 jurisdiction-disposition report and October 20, 2022 addendum report, senior protective services worker Christina Dietz indicated that she had completed a relative search on September 21, 2020, using Mother's information. Dietz called relatives named Todd Y., Nichole Y., and Michael Y. Todd Y.'s number was not in

_____

[5] In a case summary for B.Y.'s sibling, J., Clark noted that Mother had a history of mental illness, which included diagnoses for depression and bipolar disorder.

[6] The juvenile court dismissed the allegation made pursuant to section 300, subdivision (g).

service, and she left a voicemail for Michael Y. requesting a return call. Nichole Y. informed Dietz that she was not a relative of B.Y. Dietz also sent letters to the last known addresses of these identified relatives, as well as to relatives Teresa Y. and Tasha Y., as she was unable to locate telephone numbers for these relatives.[7]

On September 8, 2020, Dietz spoke to Mother by telephone. Mother denied presently experiencing mental health issues and reported that her mental health issues were in the past.

On September 8, 2020, Dietz spoke on the telephone with S.R., the adult son of A.R. S.R. indicated during that call that Mother had an older brother who was serving a life prison sentence. S.R. also reported that both of Mother's parents were deceased.

On September 10, 2020, Dietz contacted the adoptive parents of two of B.Y.'s siblings, Z. and M. The adoptive parents indicated that they were not interested in placement, contact, or visits with B.Y. Dietz also spoke to the adoptive parents of B.Y.'s other siblings, J. and A. One adoptive parent indicated that she was not interested in having B.Y. placed in her care, but she also indicated that she would call Dietz if she wanted information regarding placement or visitation.

On September 14, 2020, Gloria and Osvaldo, the adoptive parents of B.Y.'s siblings E. and K., attended a child and family team meeting. They requested that B.Y. be placed in their care.

On September 25, 2020, when contacted by Dietz, Mother reported that she had just been released from a mental health hospital, and indicated that

---

[7]     Mother and B.Y.'s relation to these individuals is not specified. As a result, it is not clear whether any of these relatives qualified as extended family members under section 224.1, subdivision (c).

staff at the mental hospital had confirmed her diagnosis for bipolar disorder. On that date, Mother also indicated to Dietz that she believed that B.Y.'s father was J.G.

On September 25, 2020, Dietz made contact with Father by phone.[8] He indicated that Mother had told him that he was likely B.Y.'s father, and he requested that a DNA test be performed. Father indicated to Dietz that he suffered from memory issues, which he attributed to having been shot in the face approximately a year prior to the telephone call.

In the September 21, 2020 jurisdiction-disposition hearing report and the October 20, 2020 addendum report, the Agency recommended that the juvenile court find B.Y.'s petition true, place him in out-of-home care, and order supervised visits for Mother. The Agency also recommended that Father be evaluated for services if "his paternity status is elevated."

At the September 21, 2020 jurisdiction-disposition hearing, counsel for Mother requested that the matter be set for a contested hearing, and the court set the matter to be heard approximately a month later.

At a special hearing on October 1, 2020, the juvenile court added Father to B.Y.'s petition as an alleged father.

Father's paternity test was collected on October 14, 2020. At the October 20, 2020 contested jurisdiction-disposition hearing, Father was present by telephone.[9] The matter proceeded by way of a trial on the documents. The juvenile court found the petition true, placed B.Y. in out-of-home care, and ordered family reunification services for Mother.

---

[8]    At this time, Father's paternity had not yet been established.

[9]    Although Father had submitted to a paternity test on October 14, 2020, the results were not available on the date of the contested jurisdiction-disposition hearing.

7

The juvenile court received Father's paternity test results on January 4, 2021; the results indicated that Father could not be excluded as B.Y.'s biological father.[10]

At a special hearing on February 10, 2021, Father was present by telephone. The juvenile court appointed counsel to represent him and granted his request to continue the hearing to obtain the case file and to assess placement options. He asked the Agency to assess him for placement. The juvenile court made a finding that Father was B.Y.'s biological father, and struck A.R. from B.Y.'s petition, entering a judgment on nonpaternity on A.R.'s behalf. The court ordered supervised visits for Father, to occur separate from Mother's visits, and authorized a voluntary psychological evaluation for him.

At a special hearing on March 9, 2021, Father indicated that he intended to file a section 388 petition to request that B.Y. be placed with him. The juvenile court set the matter for a contested hearing.[11]

Senior protective services worker Jahninia Tarango prepared the Agency's six-month review report, dated April 12, 2021. B.Y. had been placed in the home of Gloria and Osvaldo as of December 15, 2020. Tarango noted that as of August 27, 2020, the juvenile court had found that ICWA did not apply, and further indicated that "[n]o new information has been provided to the Agency" since that finding had been made. Tarango described that in

---

[10] The genetic testing showed that Father's racial background was "Mixed=Mexican/Cuban."

[11] Although the juvenile court had not made express orders that reunification services be provided to Father at either the February 10 or March 9, 2021 hearings, it appears from the record that the Agency offered Father reunification services during this time period.

8

2015, Father was placed on an involuntary psychiatric hold because he had made suicidal and homicidal statements toward Mother. In a telephone call Father had with Tarango in February 2021, Father reported that he lived with his girlfriend and soon-to-be wife, Maria, and Maria's two children. A few days later, Tarango met with Father and Maria at their residence. Father provided Tarango with documentation that showed he had been placed on an involuntary psychiatric hold in February 2020.

Tarango described communicating with a senior staff psychologist at the Agency who had opined that Father needed to undergo a neuropsychological evaluation in order for the Agency to determine which services would be most appropriate for him. Staff at the Agency were concerned about Father's mental health and brain injury; Father "struggle[d] with time and orientation," and would call the Agency "a few times a day" to ask the same questions about time, dates, and locations of services or court proceedings. Tarango also noted that she had observed that Father relied on Maria to be the "primary caregiver" during his visitations with B.Y.[12]

In the six-month review report, the Agency recommended that the juvenile court continue Father's reunification services but terminate Mother's reunification services. The Agency also recommended that B.Y. remain in his placement with Gloria and Osvaldo and that Father's visitation remain supervised.

At the six-month review hearing that took place on April 19, 2021, Father was present by telephone. Mother requested a contested hearing on

---

[12] Tarango's six-month review report indicated that Mother had been placed on involuntary psychiatric hold three times during the reporting period.

9

the issue of discontinuation of services. Father confirmed the trial date for his section 338 petition.

At the May 7, 2021 contested six-month review hearing, both parents were present by telephone. The trial proceeded by way of documents, and counsel for the Agency asked the juvenile court to adopt the recommendations attached to Tarango's six-month review report. This included requests for the court to make findings that ICWA did not apply, without prejudice, that notice under ICWA was not required because the juvenile court knows the child is not an Indian child, and that reasonable inquiry had been made to determine whether the child is or may be an Indian child.

At the hearing, the juvenile court specifically adopted "the recommendations set forth in the status review report outlines on pages 16 through 19 on the April 19th report" with two amendments and the striking of a single recommendation, none of which related to the ICWA findings. These recommendations, adopted as findings, were memorialized in the coinciding minute order of the court. The juvenile court also found that it would be detrimental to B.Y. to be placed with Father, that Mother failed to make substantial progress with the provisions of her case plan, and that there was not a substantial probability B.Y. would be returned to Mother's care. The court therefore terminated Mother's family reunification services and continued services for Father.

Protective services worker Emerald Flores submitted the 12-month review hearing report. Flores noted that no new information related to ICWA had been provided to the Agency since the August 27, 2020 findings that ICWA does not apply. Flores indicated that Father reported that on June 23, 2021, he had been diagnosed with anxiety, schizophrenia, bipolar disorder,

depression, and ADHD during a mental health screening for substance use services. Father indicated that he had been prescribed only an antidepressant, and was not actively under the care of a psychiatrist. In the 12-month review hearing report, the Agency recommended that Father's reunification services continue to the 18-month date, and that he continue to receive supervised visits.

At the 12-month review hearing of October 20, 2021, Father was present by telephone. The juvenile court adopted the recommendations attached to Flores's 12-month review report and made them the order of the court, which included recommendations that the court find, without prejudice, that ICWA does not apply, that notice under ICWA is not required because the juvenile court knows the child is not an Indian child, and that reasonable inquiry had been made to determine whether the child is or may be an Indian child. The juvenile court further found that it would be detrimental to B.Y. to be returned to the custody of either parent. It continued Father's reunification services and found that there was a substantial probability that B.Y. would be returned to Father's care by the 18-month date.

Protective services worker Monica Osuna's report for the 18-month review hearing on February 28, 2022, included results from Father's neuropsychological evaluation.[13] The evaluator observed difficulties with Father's memory and his ability to track a conversation or responsibilities, among other things. The evaluator could not provide a clear diagnosis due to the absence of formal medical documentation and the inability to verify Father's claims and statements. Gloria, the child's caretaker, reported that

---

[13] Osuna signed the report, although Flores's name was also on the report.

during this period of time, Father had seemed " 'paranoid' " during one visitation exchange. She also reported that Father had been making nonsensical statements, and that she had experienced Father acting paranoid and yelling during prior cases for B.Y.'s siblings. Father reported that on February 2, 2022, he had been in a coma after he was shot in the head. The Agency was unable to obtain any documentation to support this claim.

The Agency recommended in the 18-month review hearing report that the juvenile court terminate Father's reunification services and set a section 366.26 hearing on B.Y.'s behalf. The Agency also recommended that the court find, without prejudice, that ICWA does not apply.

At the 18-month review hearing on February 28, 2022, Father was present by telephone. Father set the matter for trial.

The contested 18-month review hearing took place on April 15, 2022. Father and Maria were present by telephone. Counsel for the Agency asked the juvenile court to adopt the recommendations attached to the 18-month review report. The juvenile court found that reasonable services had been provided to Father and that it would be detrimental to B.Y. to be returned to Father's care. The court then set a section 366.26 hearing on B.Y.'s behalf. After setting the section 366.26 hearing, the court turned to the recommendations in the 18-month review report, which included a recommendation that the court find that ICWA did not apply. The court indicated its intention to adopt the recommendations, and the coinciding minute order confirmed that the court adopted all of the recommendations in the 18-month review hearing report.

B. *The permanency planning phase and additional initial inquiry under ICWA*

The Agency's section 366.26 report, authored by protective services worker Aaron Nuno, noted that Mother had largely absented herself from the

case. Mother had not visited B.Y. during the case, and Nuno was unsuccessful in reaching her by telephone between May 20, 2022 and July 28, 2022. At the time Nuno finalized his report, Mother's whereabouts were unknown to the Agency. The Agency filed a declaration of due diligence to show its search efforts for Mother. In searching for Mother, the Agency called the telephone number associated with Todd Y., Mother's brother. The individual who answered the telephone reported that the Agency had the wrong number. The Agency also called the telephone number associated with B.Y.'s maternal grandmother, Kathy Y. That number appeared to be associated with a fax machine. The maternal grandmother's last known address was unknown, and B.Y.'s maternal grandfather's identity was unknown to the Agency.

The Agency recommended that the juvenile court terminate parental rights and designate a permanent plan of adoption. The Agency also recommended that the court make a finding that "the Indian Child Welfare Act does not apply in this case."

At the originally set section 366.26 hearing on August 15, 2022, Father and B.Y.'s caretaker Gloria were present by telephone. Father's counsel and Mother's counsel both requested a contested hearing.

In an addendum report, authored by senior protective services worker Pamatz, the Agency requested a 60-day continuance of the October 11, 2022 hearing date in order to assess B.Y.'s permanent plan and to complete inquiry under ICWA. Pamatz noted that "[t]he Agency needs to contact family members to conduct ICWA inquiry."

On the October 11, 2022 date of the contested section 366.26 hearing, Father and Gloria were present by telephone. At this time, however, the

juvenile court granted the Agency's request for a continuance and set the continued hearing for December 12, 2022.

Pamatz filed a second addendum report on December 8, 2022. This addendum report included a section devoted to describing the Agency's ICWA inquiry. On November 7, 2022, Pamatz conducted an ICWA inquiry with Father. Father reported that his mother was from Oaxaca, Mexico and his father was from Cuba. Father denied any knowledge that anyone in his family had Native American ancestry, denied that anyone in his family had ever lived on a reservation, and denied that anyone in his family ever received any financial, medical, or educational assistance from a tribe. Father also denied that anyone in his family spoke a Native American language or was an enrolled member of a tribe. Father indicated that he did not know of anyone else in his family who may have had more information about the family's Native American ancestry.

On December 6, 2022, Pamatz conducted an ICWA inquiry with B.Y.'s paternal grandmother. The paternal grandmother identified as Mexican from Acapulco Guerrero. She denied being aware of anyone in her family who may have Native American ancestry, denied that anyone in her family ever lived on a reservation, and denied that anyone in her family ever received any financial, medical, or educational assistance from a tribe. The paternal grandmother also denied that anyone in her family spoke a Native American language or was an enrolled member of a tribe. She, like Father, did not know of anyone else in her family who may have possessed more information about potential Native American ancestry in her family.

Also on December 6, 2022, Pamatz attempted to contact Todd Y., B.Y.'s maternal uncle, at his last known telephone number in order to conduct an ICWA inquiry. A message indicated the telephone number was disconnected

or no longer in service. That same day, Pamatz called Mother at her last known telephone number to conduct an ICWA inquiry. Pamatz received a message on that line as well that indicated the telephone number was disconnected or no longer in service.

Mother's whereabouts remained unknown. Pamatz attempted to contact Mother twice at her last known telephone number but was unsuccessful. Mother's counsel had the same telephone number for Mother as the Agency, but also had an email address for Mother, which counsel provided to Pamatz. On December 6, 2022, Pamatz sent Mother an email. At the time Pamatz finalized the December 12, 2022 addendum report, Pamatz had been unable to locate Mother.

At the December 12, 2022 continued contested section 366.26 hearing, Father was present by telephone. The juvenile court granted Father's request to continue the hearing to file a petition under section 388 and continued the hearing for two days.

C. *The combined contested hearing under sections 388 and 366.26*

The day of the December 14, 2022 continued contested section 366.26 hearing, Father filed a petition under section 388. Father asked the juvenile court to change its order terminating his reunification services and setting a section 366.26 hearing. He requested that B.Y. be placed in his care with a provision of family maintenance services. Father asserted that changed circumstances existed because he addressed his mental health via a program that provided mental health treatment and services, took medication, and visited B.Y. weekly. Regarding best interests, Father claimed that B.Y. had bonded to him. He also asserted B.Y. would benefit from a relationship with him, which would promote connection to the "extended paternal family."

15

At the December 14, 2022 contested section 366.26 hearing, Father and Gloria were present by telephone. After hearing argument on whether Father's section 388 petition met the prima facie requirements, the juvenile court summarily denied Father's petition. The juvenile court addressed the issues as required under section 366.26. It received the Agency's reports into evidence without objection. After hearing the arguments of counsel, the juvenile court found B.Y. adoptable and further found by clear and convincing evidence that none of the circumstances listed in subdivision (c)(1) of section 366.26 existed in the case. The court then terminated parental rights and freed B.Y. for adoptive placement.

The juvenile court then "[t]urn[ed]" to the Agency's recommendations in the section 366.26 hearing report. The court specifically stated that it was making findings consistent with two of the Agency's recommendations—both of which were unrelated to ICWA—by clear and convincing evidence. The court then made an ambiguous statement about adopting the Agency's recommendations. The court's minute order from the hearing includes a statement that the court made a finding that ICWA does not apply to this case.

Father filed a timely notice of appeal.

## III.

## DISCUSSION

A. *Applicable law*

Congress enacted ICWA to address concerns regarding the separation of Indian children from their tribes through adoption or foster care placement with non-Indian families. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7 (*Isaiah W.*) ICWA requires that notice of the state court proceedings be given to Indian tribes "where the court knows or has reason to know that an Indian child is

16

involved, . . . ." (25 U.S.C. § 1912(a); see *Isaiah W.*, at p. 8); *In re Benjamin M.* (2021) 70 Cal.App.5th 735, 740-741 (*Benjamin M.*).) ICWA's notice requirement, which is also codified in California law (§ 224.3), "enables a tribe to determine whether the child is an Indian child and, if so, whether to intervene" in the state court proceeding or exercise its own jurisdiction in the matter. (*Isaiah W.*, at p. 5.)

Under California law adopted pursuant to ICWA, the juvenile court and Agency have an "affirmative and continuing duty to inquire" whether a child "is or may be an Indian child."[14] (§ 224.2, subd. (a); see *Isaiah W.*, *supra*, 1 Cal.5th at p. 9.)

As outlined by this court in *In re D.S.* (2020) 46 Cal.App.5th 1041, 1052, "section 224.2 creates three distinct duties regarding ICWA in dependency proceedings. First, from the Agency's initial contact with a minor and his family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id.*, subd. (e), italics added.) Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply."

---

[14] An " 'Indian child' " is defined in the same manner as under federal law, i.e., as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]" (25 U.S.C. § 1903(4); accord, Welf. & Inst. Code, § 224.1, subd. (a) [adopting the federal definition].)

The duty of initial inquiry begins with the initial contact when the Agency is required to ask "the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (§ 224.2, subd. (a).) Once a child is taken into temporary custody pursuant to section 306, the Agency must ask the child, parents, legal guardian, extended family members, and others who have an interest in the child whether the child is or may be an Indian child. (§ 224.2, subd. (b); see *In re D.S.*, *supra*, 46 Cal.App.5th at pp. 1049, 1052.) Extended family members include adults who are the child's stepparents, grandparents, aunts, uncles, brothers, sisters, nieces, nephews, or first or second cousins. (25 U.S.C. § 1903(2); § 224.1, subd. (c).) The Agency is obligated "to make a meaningful effort to locate and interview extended family members to obtain whatever information they may have as to the child's possible Indian status." (*In re K.R.* (2018) 20 Cal.App.5th 701, 709.) The Agency's filings with respect to its ICWA initial duty to inquire "must include 'a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status.' " (*In re Dominick D.* (2022) 82 Cal.App.5th 560, 566 (*Dominick D.*).)

The juvenile court "has a responsibility to ascertain that the agency has conducted an adequate investigation and cannot simply sign off on the notices as legally adequate without doing so." (*In re K.R.*, *supra*, 20 Cal.App.5th at p. 709.) If the court finds that the Agency has complied with its duty of inquiry and there is no reason to know that the child is an Indian child, then the court may find that ICWA does not apply. (§ 224.2, subd. (i)(2); Cal. Rules of Court, rule 5.481(b)(3)(A).) "A juvenile court's finding that ICWA does not apply implies 'that social workers had fulfilled their duty of

18

inquiry.'" (*Dominick D.*, *supra*, 82 Cal.App.5th at p. 567, citing *In re Austin J.* (2020) 47 Cal.App.5th 870, 885.)

"On appeal, we review the juvenile court's ICWA findings for substantial evidence." (*In re D.S.*, *supra*, 46 Cal.App.5th at p. 1051.) However, where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied. (*Ibid*.)

B. *The record demonstrates that the juvenile court expressly found that that ICWA does not apply*

Father's main argument on appeal is that "[w]e do not have an explicit finding on ICWA in this record." He argues that "there is no mention made of ICWA . . . in any of the minute orders." Father further contends that this court should not imply a finding with respect to ICWA, because "the better practice is that the ruling should be clear and explicit," and he urges that even if the law previously permitted reviewing courts to imply the necessary inapplicability finding, more recent changes to the law counsel in favor of requiring an express finding that ICWA does not apply.

We disagree with Father's reading of the record, and instead conclude that the record demonstrates that the court made a considered finding that ICWA does not apply to this case. At the section 366.26 hearing, the court admitted in evidence "all of the documents proffered by the [A]gency," which included the Agency's August 15, 2022 section 366.26 report and addendums to that report. These reports included information describing the Agency's ICWA inquiry, as well as a recommendation that the court make a finding that ICWA does not apply to this proceeding. Later, the court stated, "Turning to the recommendations in the August 15th 366.26 hearing [report], No. 11, I found that by clear and convincing evidence[,] [a]nd No. 15 I also found by clear and convincing evidence, and I'll adopt those recommendations." Although the court's statement about the "those

19

recommendations" is ambiguous, in that the court could have been referring to all of the Agency's recommendations in the August 15, 2022 report, or it could have been referring to adopting only recommendation numbers 11 and 15, the remainder of the record convinces us that the court intended its statement to reflect that it was adopting *all* of the Agency's recommendations in the reference report. Specifically, the corresponding minute order from the section 366.26 hearing reflects that the court adopted all of the recommendations made by the Agency in its August 15, 2022 section 366.26 hearing report. The August 15, 2022 section 366.26 hearing report included the recommendation that the juvenile court make a finding that ICWA did not apply. Moreover, the minute order not only makes clear that the court adopted this and the other recommendations, but it also includes a specific separate finding by the court "that the Indian Child Welfare Act does not apply to this proceeding."

Father nevertheless contends that the reporter's transcript and the clerk's transcript are in conflict, and he argues that where a reporter's transcript and a clerk's transcript conflict, the "Reporter's Transcripts . . . govern." However, as we have explained, we disagree with Father that the reporter's transcript and the clerk's transcript are necessarily in conflict. Moreover, even if the two transcripts were in conflict, it is our obligation to attempt to harmonize the record; only if harmonization is impossible should we give greater weight to one aspect of the record over another. (See *People v. Anzalone* (2013) 56 Cal.4th 545, 552, fn. 6 [" 'As a general rule, a record that is in conflict will be harmonized if possible. [Citation.] If it cannot be harmonized, whether one portion of the record should prevail as against contrary statements in another portion of the record will depend on the circumstances of each particular case.' "].) Obviously

20

harmonization of these two portions of the record is not impossible; when considered together, it becomes apparent that the juvenile court was stating its adoption of all of the Agency's recommendations, including the recommendation that the court make a finding that ICWA does not apply. We therefore reject Father's argument that the juvenile court erred in failing to make an express finding that ICWA does not apply in this matter.[15]

C.  *There is sufficient evidence to support the juvenile court's finding that ICWA does not apply*

Father next contends that although "a case can be made that, given [Father's] background, he has no cognizable Native American ancestry and that the investigation was adequate, the same cannot be said of the minor's mother, N[.]" He suggests that even though Mother's parents "are likely deceased," the record suggests that Mother has "at least two brothers," and

---

[15]  We note that the juvenile court also made findings that ICWA did not apply during earlier proceedings in this matter. However, the record demonstrates that many of these findings were based on (1) the court's initial finding at the August 27, 2020 detention hearing that ICWA did not apply in this matter, and (2) the Agency's subsequent representations that no new information had been supplied that would suggest that ICWA might apply. However, at the time the court made the nonapplicability finding at the detention hearing, a different man had been identified as B.Y.'s presumptive father, and the Agency had inquired only of that man about his possible Native American Indian heritage. Thus, the court's early finding was based on an inquiry of an individual who was later determined to be unrelated to B.Y. The Agency's reports at or around the time that Father was identified as the possible biological father of B.Y. and at or around the time he was determined to be B.Y.'s biological father do not include information as to whether the Agency inquired of Father if he had any known Native American Indian ancestry. Thus, the court's earlier findings that ICWA did not apply may not have been based on an ICWA inquiry that was sufficient vis-à-vis Father. However, as we explain in part III.C., *post*, the Agency did ultimately undertake an ICWA inquiry with respect to Father, and Father effectively concedes that the Agency's inquiry as to him was adequate.

reveals that the Agency failed to "ask[ ] [Mother] if she had any other relatives who might know about whether she had any Indian ancestry such as aunt/uncle or cousin who might have information."

In connection with the duty of initial inquiry, a social services agency is obligated "to make a meaningful effort to locate and interview extended family members to obtain whatever information they may have as to the child's possible Indian status." (*In re K.R.*, *supra*, 20 Cal.App.5th at p. 709.) Contrary to Father's contention, this record demonstrates that the Agency made a meaningful effort to locate and interview B.Y.'s maternal family members, even if the Agency's attempts were ultimately limited and somewhat unsuccessful. When B.Y. was initially detained, the Agency inquired with Mother about her potential Native American Indian ancestry, and Mother gave the Agency "no reason to believe the child is or may be an Indian child." In addition, Mother's attorney disclaimed any Native American Indian ancestry on Mother's behalf.

The Agency also attempted to conduct an ICWA inquiry of Mother's brother, but it was unable to contact him on multiple dates (including early in the case when attempting to locate him to inquire about Mother and about possible placement). Father suggests that there is evidence in the record that Mother has two brothers, based on a comment provided by the adult son of the man who was ultimately determined not to be B.Y.'s father to the effect that Mother had an older brother who was serving time in prison for murder. Father's contention is speculative, and rests on assumptions that need not be drawn from the record. It is not clear that the adult son of the man initially identified as the presumptive father has entirely accurate information about Mother's family or what his knowledge might be based on, and it is also not clear that even if the report that Mother has a brother in prison is itself

22

accurate, that this brother must be someone other than her brother identified as "Todd" elsewhere in the record.[16]  We decline to conclude that the Agency's efforts to locate maternal family members was not meaningful because it did not attempt to find this purported second brother.

Even if we assume, however, that the Agency failed to meet its initial inquiry obligation, Father cannot demonstrate prejudice.  Although we acknowledge that different Courts of Appeal have applied varying analytical frameworks to evaluate whether errors occurring in connection with the ICWA initial inquiry duty are prejudicial, this division has adopted the approach articulated in *Benjamin M., supra,* 70 Cal.App.5th 735. (*In re Y.M.* (2022) 82 Cal.App.5th 901, 916).  Under this approach, the challenged error is harmless unless "the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child" and that "the probability of obtaining meaningful information is reasonable." (*Benjamin M.*, at p. 744.)

Here, any information the Agency may have obtained from an inquiry of any additional maternal extended family members was not likely to bear meaningfully on whether B.Y. is an Indian child, and Father's protestations otherwise ring hollow, given that fact that this record demonstrates that the court previously made a finding that ICWA did not apply the proceedings of Mother's other six children, all of whom are B.Y.'s full siblings.  In addition, with respect to those children and B.Y., Mother has repeatedly denied any

16    Father suggests that the Agency should have contacted the "only six individuals serving time in California's prison system sharing [Mother's] and Todd's surname."  However, even assuming the statement about Mother having a brother serving time in prison was based in fact, the individual who made the statement did not indicate that the brother was incarcerated in California.

23

Native American Indian ancestry, and it is not likely that an inquiry of other maternal relatives would have revealed information likely to bear meaningfully on the issue of B.Y.'s Indian status. Thus, any presumed error in the Agency's failure to track down Mother's purported second brother or other unidentified maternal relatives was harmless.

## IV.

## DISPOSITION

The December 24, 2022 order is affirmed.

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

BUCHANAN, J.